# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 9, 2012                Decided June 21, 2013

No. 11-7142

GEORGE EMORY, ET AL.,
APPELLANTS

v.

UNITED AIR LINES, INC., A CORPORATION AND WHOLLY
OWNED SUBSIDIARY OF UAL CORPORATION AND AIR LINE
PILOTS ASSOCIATION,
APPELLEES

UNITED STATES OF AMERICA,
INTERVENOR

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-02227)

———

No. 12-5026

GRANT O. ADAMS, ET AL.,
APPELLANTS

TROY G. AVERA, ET AL.,
APPELLEES

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01646)

————

*John S. Lopatto III* argued the cause and filed the briefs for appellants in Case No. 11-7142.

*Granville C. Warner* argued the cause for appellee Air Line Pilots Association International in Case No. 11-7142. *Gary S. Kaplan* argued the cause for appellee United Air Lines, Inc. in Case No. 11-7142. With them on the brief were *Marta Wagner* and *Eric Jansen*. *Jonathan A. Cohen* entered an appearance.

*Jonathan Turley* argued the cause and filed the briefs for appellants in Case No. 12-5026.

*Edward Himmelfarb*, Attorney, U.S. Department of Justice, argued the cause for appellees in Case No. 12-5026. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Michael Jay Singer*, Attorney.

Before: ROGERS and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: With the enactment of the Fair Treatment for Experienced Pilots Act of 2007 ("FTEPA" or "Act"), Pub. L. No. 110-135, 121 Stat. 1450, Congress repealed the Federal Aviation Administration's ("FAA") long-contested "Age 60 Rule" and extended the maximum age for piloting commercial flights by five years to 65. FTEPA marked a significant victory for opponents of the old regime, but not everyone was satisfied. Under the Act's nonretroactivity provision, 49 U.S.C. § 44729(e)(1), pilots who had turned 60 prior to FTEPA's enactment date and did not qualify for either one of two narrowly drawn statutory exceptions would be denied the benefits of the Age 65 Rule and, as was often the case, terminated.

Denied these extra years of employment as commercial pilots, the aggrieved over-60 pilots sued. Plaintiffs in *Adams v. United States*, 796 F. Supp. 2d 67 (D.D.C. 2011), challenged the constitutionally of the nonretroactivity and protection-for-compliance provisions as well as FAA's implementation of them.[1] By contrast, plaintiffs in *Emory v. United Air Lines, Inc.*, 821 F. Supp. 2d 200 (D.D.C. 2011), supplemented their constitutional objections with a number of state and federal claims against their employer, United Air Lines ("United"), and their union, Air Line Pilots Association ("ALPA"), for advancing allegedly discriminatory interpretations of the nonretroactivity provision they knew — or should have known — to be incorrect. The District Courts

---

[1] A previous panel of this Court dismissed Adams's original suit, a petition for review of an FAA order denying pilots exemptions from the Age 60 Rule, as moot under the then-recently enacted FTEPA. *See Adams v. FAA*, 550 F.3d 1174, 1176 (D.C. Cir. 2008) ("The Act, which expressly abrogates the Age 60 Rule, moots the petitions for review of the orders denying exemption from the Age 60 Rule.").

in both cases found in favor of the defendants, *see Adams*, 796 F. Supp. 2d at 80; *Emory*, 821 F. Supp. 2d at 243, and the present appeals followed.[2]

Believing as we do that FTEPA passes constitutional muster and should be interpreted as the *Emory* defendants have done, we affirm the District Courts' judgments as to all claims not dismissed as moot.

## I. BACKGROUND

First implemented in 1959, FAA's so-called Age 60 Rule barred any person 60 years of age or older from serving as a pilot in flights conducted under Part 121 of the Federal Aviation Regulations. *See* 14 C.F.R. § 121.383(c) (2007).[3] Although the Rule survived nearly a half-century's worth of challenges in federal courts, *see, e.g.*, *Prof'l Pilots Fed'n v. FAA*, 118 F.3d 758 (D.C. Cir. 1997), institutional support for the age 60 ceiling dwindled. In 2006, the International Civil Aviation Organization ("ICAO") revised the maximum age

---

[2] "Although this court did not formally consolidate the separate appeals[,] . . . they were argued on the same day before the same panel, and we find it convenient to dispose of both appeals with a single opinion." *Hunt v. United States*, 636 F.2d 580, 583 n.5 (D.C. Cir. 1980).

[3] "Part 121 governs the operations of most commercial airlines." *See Jones v. ALPA*, 642 F.3d 1100, 1102 (D.C. Cir. 2011); *see also* 14 C.F.R. § 121.1. The Age 60 Rule did *not* extend to certain non-commercial flights, including "Part 91" flights, often called "non-revenue or company flights," *Emory* Appellants' Br. 7, and applied only to captains and first officers, not certain other crew members such as flight engineers. *See TWA v. Thurston*, 469 U.S. 111, 115 n.3 (1985).

from 60 to 65 for certain pilots in international operations. FAA responded by establishing the Age 60 Aviation Rulemaking Committee ("ARC") to make recommendations regarding the adoption of the ICAO standard, but the "polarized" Commission, with its 17 members "representing pilot unions, airlines, the aeromedical community, and the FAA," AGE 60 AVIATION RULEMAKING COMMITTEE, REPORT TO THE FEDERAL AVIATION ADMINISTRATION 1, 31 (Nov. 29, 2006), agreed on just one thing: "Any change to the Age 60 Rule should be prospective." *Id.* at 31.

Undeterred by the false start, FAA soldiered on. In January 2007, the agency announced it would amend the Age 60 Rule. Congress, however, preempted this rulemaking with the passage of FTEPA in December 2007. Among other changes, FTEPA abrogated the Age 60 Rule as of the Act's December 13, 2007, enactment date and replaced it with a new ceiling colloquially referred to as the "Age 65 Rule." 49 U.S.C. § 44729(d). Crucially, Congress gave the Age 65 Rule entirely prospective effect with just two exceptions. As codified in the Act's "Nonretroactivity" provision, *id.* § 44729(e)(1), an over-60 pilot that served as a "required flight deck crew member" ("RFDCM") on December 13, 2007, *id.* § 44729(e)(1)(A), or was subsequently hired as a new pilot without seniority, *id.* § 44729(e)(1)(B), could return to piloting Part 121 flights until age 65.

A safe harbor provision entitled "Protection for compliance" prevents any "action taken in conformance with this section . . . or taken prior to the date of enactment of this section in conformance with [the Age 60 Rule]" from "serv[ing] as a basis for liability or relief in a proceeding, brought under any employment law or regulation, before any court or agency of the United States or of any State or locality." *Id.* § 44729(e)(2).

## II. *ADAMS V. UNITED STATES*

### A. OVERVIEW

The approximately 200 *Adams* plaintiffs can be split into two classes: (1) pilots who turned 60 and were retired under the Age 60 Rule some months or years before the December 13, 2007, enactment date,[4] and (2) pilots who turned 60 between December 1 and 12, 2007, but remained in the air carrier's employ until December 31.[5] Together they bring a veritable litany of constitutional and Administrative Procedure Act ("APA") claims against FTEPA's nonretroactivity and protection-for-compliance provisions as well as FAA's purportedly arbitrary and unlawful implementation of the two. *See Adams* Compl. ¶¶ 310–98. Although initially justiciable, the passage of time has called into question our ability to provide effective relief in this suit against the government. We turn to that threshold issue now.

### B. MOOTNESS

An old axiom reminds us that time and tide wait for no

---

[4] Curiously, the complaint also names pilots who were over 65 on December 13, 2007, *Adams* Compl. ¶ 17, as well as those who had not yet turned 60, *Adams* Compl. ¶¶ 52, 62. Whatever the explanation, we think it clear that these pilots are without standing to challenge a nonretroactivity provision that caused them no injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[5] This latter class includes George V. Emory and Lorenzo M. Sein, plaintiffs in the companion case. *Adams* Compl. ¶¶ 70, 188; *Emory* Compl. ¶¶ 12(d); 12(f).

man. Or pilot, we add.

The window on the nonretroactivity provision closed December 13, 2012, the five-year anniversary of the Act's enactment. On that date, *every* pilot for whom the prohibition against retroactivity (and the exemptions thereto) would have applied — pilots aged 60 to 64 the day FTEPA took effect — would have turned 65.[6] We can now say with mathematical certainty that all members of this temporally circumscribed class are disqualified under the Age 65 Rule from ever piloting Part 121 flights.[7] Restated, as of December 13, 2012, no pilot will ever be kept from — or allowed to return to — piloting Part 121 flights by operation of § 44729(e)(1).

The government's supplementary filing, submitted shortly after the five-year anniversary, urged us to dismiss the *Adams* appeal as moot. *See Adams v. United States*, No. 12-5026, Doc. No. 1410861 (D.C. Cir. Dec. 18, 2012) ("Mootness Memo"). The government attacks Adams's complaint for failing to allege any cognizable relief, explaining the case is moot "because the plaintiffs seek only equitable relief. Despite their scattered references to damages in their brief, damages are, of course, unavailable under the

---

[6] Those who had not yet turned 60 as of December 13, 2007, would have aged seamlessly into FTEPA's Age 65 regime; those 65 and older would have already aged out. So viewed, this targeted provision might be best understood as a stopgap measure designed to aid in the transition from the Age 60 to the Age 65 Rule.

[7] Plaintiffs have not challenged the constitutionality of Congress's decision to use 65 as the maximum flying age. *See Adams* Reply Br. 16 ("[T]he statutory provision being challenged is the seniority-stripping provision of the FTEPA, not the adjustment of the maximum flying age to 65.").

APA, and there is no waiver of sovereign immunity to support an award of damages upon a declaration that a statute is unconstitutional." *Id.* at 3–4. Plaintiffs respond with nearly a dozen rapid-fire arguments in the hope that one sticks, *see Adams v. United States*, No. 12-5026, Doc. No. 1413923 (D.C. Cir. Jan. 7, 2013), and the government's reply effectively doubles down on earlier arguments, *see Adams v. United States*, No. 12-5026, Doc. No. 1415502 (D.C. Cir. Jan. 16, 2013). We think the government only partially correct.

\* \* \*

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation marks omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (internal quotation marks and brackets omitted).

Although the government has made a strong conceptual case for mootness on *Adams*'s facts, we cannot say resolution of this jurisdictional issue is so cut-and-dried. Absent from the government's analysis is a discussion of *Emory*, the companion case with two overlapping plaintiffs. *See supra* n.5. The *Emory* plaintiffs did appeal the District Court's dismissal of their constitutional challenges to FTEPA, *see Emory*, 821 F. Supp. 2d at 219–24, but rather than brief the issues in full, chose instead to incorporate by reference Adams's arguments on these issues, *see Emory* Appellants' Br. 5 n.1; *Emory* Appellants' Br. 57. As a direct consequence of this litigation strategy, certain constitutional claims appear in both *Adams* and *Emory*. This substantive overlap proves quite important for mootness purposes.

In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court acknowledged a narrow set of circumstances in which a court could "decid[e] the cause of action before resolving Article III jurisdiction." *Id.* at 98. Specifically, where "the merits question [is] decided *in a companion case*, with the consequence that the jurisdictional question could have no effect on the outcome," courts are free to "decline[] to decide th[e] jurisdictional question." *Id.* (internal citation omitted). We believe *Adams* and *Emory* fall comfortably within *Steel Co.*'s parameters. Consequently, where *Emory* (1) advances an analogous constitutional claim and (2) that claim is not moot on *Emory*'s distinct facts, we are free to bypass the threshold mootness inquiry in *Adams* and reach the merits.

We think the *Steel Co.* exception applies to Adams's equal protection, due process, and bill of attainder claims, all of which appear in the *Emory* complaint. *Compare Adams* Compl. ¶¶ 352–79, 389–98, *with Emory* Compl. ¶¶ 94-96. The only lingering question is whether the claims are moot in *Emory*. That is, whether *Emory* plaintiffs have a concrete interest in their resolution. We believe they do — an unsurprising proposition when one considers how Emory, unlike Adams, named private parties as defendants. *Cf.* Mootness Memo at 4 (highlighting the sovereign immunity issues in *Adams* where "no former, current, or potential air-carrier employer is a defendant"). To declare the protection-for-compliance provision unconstitutional would effectively deprive United and ALPA of FTEPA's safe harbor. *See, e.g.*, *Emory*, 821 F. Supp. 2d at 218, 243; *Emory* Appellees' Br. 30–31.[8] Obviously Emory stands to benefit from the

---

[8] Since it would be difficult to determine whether the protection-for-compliance is unconstitutional without first determining the scope of "compliance," we believe plaintiffs'

elimination of the defendants' affirmative defense. For this reason, then, we are free to reach the merits of Adams's parallel claims.

We cannot do the same with Adams's takings claim, however, because there is no analogous challenge in *Emory*. To be sure, the *Emory* plaintiffs did purport to "incorporate the . . . Taking . . . arguments . . . made by appellants in [*Adams*]," *Emory* Appellants' Br. 57, but their complaint simply failed to make a distinct Fifth Amendment takings claim.[9] Deprived of their *Emory* crutch, plaintiffs' takings claim will only survive if there exists independent grounds to defeat mootness. Unfortunately for Adams, we see none. Not even monetary damages are available to plaintiffs here.[10]

Adams's remaining challenges to FAA's interpretation of FTEPA — the other claims for which there are no analogues in *Emory* — meet the same fate. These claims are expressly

---

claims as to the correct interpretation of § 44729(e)(1) are likewise ripe for review.

[9] The District Court's silence on the takings issue bears this point out. *Compare Emory*, 821 F. Supp. 2d at 208, *with Adams*, 796 F. Supp. 2d at 73 ("Plaintiffs allege that these provisions violate . . . the Takings Clause").

[10] While it is true that FED. R. CIV. P. 54(c) allows a court to grant relief not specifically sought, we cannot save Adams's claim by reading the complaint's boilerplate prayer for "such other relief as [the Court] may deem just and proper," *Adams* App'x 114, as a request for monetary damages. *See Hedgepeth v. WMATA*, 386 F.3d 1148, 1152 n.2 (D.C. Cir. 2004) (Roberts, J.); *Dellums v. NRC*, 863 F.2d 968, 975 n.8 (D.C. Cir. 1988). Even if we could, the Court lacks jurisdiction to hear such a claim. *See* 28 U.S.C. § 1295(a)(2); *id.* § 1491(a)(1).

predicated on the APA, which waives sovereign immunity only for "[a]n action . . . seeking relief other than money damages." 5 U.S.C. § 702; *see also Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Kidwell*, 56 F.3d 279, 283–84 (D.C. Cir. 1995).[11] Having given due consideration to what remains of Adams's scatter-shot arguments and found them wanting, we hold on the unique facts of this case that Adams's claims against FAA are likewise moot.

## C. ANALYSIS

In *Adams* as in *Emory* we review the District Court's grant of a motion to dismiss *de novo*, "accepting the factual allegations made in the complaint as true and giving plaintiffs the benefit of all inferences that can reasonably be drawn from their allegations." *Wagener v. SBC Pension Benefit Plan-Non Bargained Program*, 407 F.3d 395, 401 (D.C. Cir. 2005).

### 1. Fifth Amendment Equal Protection

---

[11] The complaint challenges FAA's actions as "unlawful and subject to be set aside under" 5 U.S.C. § 706, *see Adams* Compl. ¶¶ 325, 335, 340, 346, 351, while the prayer for relief specifically seeks "damages and reasonable attorneys' fees and costs incurred in maintaining this action *pursuant to* 5 U.S.C. § 706(2)(B)," *Adams* App'x 114 (emphasis added). The damages sought are not the sort of "specific relief" allowed under the APA, *see Bowen v. Massachusetts*, 487 U.S. 879, 892–94 (1988), and it is established in this Circuit that where "the underlying controversy is moot," a "request for attorneys' fees [will not] preserve[] the merits of that controversy for our consideration." *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984).

Because age is not a suspect or protected class, it is entitled only to rational basis review. *See, e.g.*, *Kimel v. Fl. Bd. of Regents*, 528 U.S. 62, 83 (2000); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976) (per curiam) (employing the "relatively relaxed" rational basis standard to age-based classifications while noting that such legislative action "is presumed to be valid").[12] Under rational basis review, a legislative classification "must be upheld against equal protection challenge if there is *any* reasonably conceivable state of facts that *could* provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (emphases added). The burden of disproving the rationality of the law falls squarely on plaintiffs. *See Hettinga v. United States*, 677 F.3d 471, 478–79 (D.C. Cir. 2012) (per curiam). That burden has not been met here.

The government defends the Act's nonretroactivity by asserting a rational relationship to Congress's "concern for workplace harmony, which is a legitimate legislative concern under federal labor law." *Adams* Appellees' Br. 23. We think this suffices under the rational basis standard.

Air carriers hired new pilots in anticipation of the Age 60 Rule remaining in effect. Had Congress given FTEPA full retroactive effect, carriers might have reintroduced a significant number of over-60 pilots back into the Part 121

---

[12] We decline Adams's invitation to apply a more stringent form of review to age classification on the basis of two dissimilar cases, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), and *Romer v. Evans*, 517 U.S. 620 (1996). Not only do these cases predate *Kimel* by 15 and 4 years, respectively, but the Court in *Cleburne* made clear that it has "declined . . . to extend heightened review to differential treatment based on age." 473 U.S. at 441.

workforce with full seniority. Given the hierarchical nature of airline employment, the influx of senior pilots would have "bumped" less senior pilots and potentially caused some of the most junior to be fired. *See Avera v. ALPA*, 436 Fed. App'x 969, 975 (11th Cir. 2011); *Jones v. ALPA*, 713 F. Supp. 2d 29, 35 (D.D.C. 2010). Congress, it follows, did not act unreasonably or irrationally in tailoring the retroactive effect of its legislation to minimize the potential disruption to labor relations in the airline industry. *See, e.g.*, *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 680 (1987) (highlighting the "the heavily regulated nature of the [airline] industry"). Two additional considerations underscore the reasonableness of the legislature's actions.

Speaking in favor of the Act, Representative Petri warned that the United States is "facing a pilot shortage in the near future" with an estimated "1 billion passengers flying annually" by 2015. 153 Cong. Rec. H15252-02, 2007 WL 4325399 (daily ed. Dec. 11, 2007). To the extent Congress thought it necessary to plan for such eventualities, it was eminently rational to choose the path in which fewer junior pilots — those who will be around to meet the rising demand — would be denied experience flying large jets. More fundamentally, accepting that Congress was free to heed the advice of the ARC and draft the law prospectively, *see E. Enters. v. Apfel*, 524 U.S. 498, 547–48 (1998) (Kennedy, J., concurring in the judgment and dissenting in part) ("[P]rospective economic legislation carries with it the presumption of constitutionality . . . ."), it would be an odd thing indeed to hold the legislature has acted irrationally in attempting to strike a less draconian balance by providing *some* measure of protection to over-60 pilots. In short, we think the District Court properly dismissed the equal protection challenge.

## 2. Fifth Amendment Due Process

"The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving him a chance to be heard." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). Over a half century ago, at the outset of the Age 60 litigation, the Second Circuit in *ALPA v. Quesada*, 276 F.2d 892 (2d Cir 1960), applied this longstanding principle to hold that there could be no procedural due process violation in FAA's promulgation of the Age 60 Rule. What was true of the original rule then is no less true of FTEPA's nonretroactivity provision today: it was "the very antithesis of adjudication; it was the formulation of a general rule to be applied to individual pilots at a subsequent time." *Id.* at 896. Thus, even assuming plaintiffs have a cognizable property interest, we agree with the District Courts that the procedural due process objections are meritless. *See Adams*, 796 F. Supp. 2d at 75; *Emory*, 821 F. Supp. 2d at 221–22; *Jones*, 713 F. Supp. 2d at 36–37.

For the reasons discussed in the equal protection discussion, *supra* Section II.C.1., the substantive due process challenges likewise fail. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976) ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 523 (D.C. Cir. 2003); *Jones*, 713 F. Supp. 2d at 37 n.7. This "doctrine normally imposes only very slight burdens on the

government to justify its actions" and those burdens have been met. *George Washington Univ. v. Dist. of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003).

### 3. Bill of Attainder

A law is an impermissible bill of attainder "if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (internal quotation marks omitted). The court below never addressed the specificity requirement, choosing instead to resolve the matter on the second prong. *See Adams*, 796 F. Supp. 2d at 77. We follow suit.

To determine whether a statute imposes punishment, we ask:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Foretich*, 351 F.3d at 1218 (quoting *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 852 (1984)). Although the second factor tends to be "the most important," each could serve as an "independent — though not necessarily decisive — indicator of punitiveness." *Id.* at 1218. Let us consider the three in turn.

First, we find no merit to Adams's initial effort to classify FTEPA as a barrier to employment, "a classic historical form of punishment." *Adams* Appellants' Br. 50. Although correct on the history, *see Selective Serv. Sys.*, 468 U.S. at 852 (Bill

16

of Attainder Clause "has expanded to include legislative bars to participation by individuals or groups in specific employments or professions"), Adams overstates his case. FTEPA is readily distinguishable from the paradigmatic "barrier" cases as they have been described by the Supreme Court.[13] The Act did not prevent pilots between the ages of 60 and 65 from seeking and obtaining employment in Part 121 operations; it provided them with an opportunity to return as pilots on Part 121 flights, albeit without seniority.[14] Nor did FTEPA prevent over-60 pilots from accepting employment with international carriers or looking elsewhere for similar

---

[13] In a string cite, the Supreme Court in *Selective Service Systems* identified those cases as follows:

> *See, e.g.*, *United States v. Brown*, 381 U.S. 437 (1965), in which Communist Party members were barred from offices in labor unions; *United States v. Lovett*, 328 U.S. 303 (1946), in which the law in question cut off salaries to three named Government employees; *Cummings v. Missouri*, 4 Wall. 277 (1867), in which a priest was disqualified from practicing as a clergyman; and *Ex parte Garland*, 4 Wall. 333 (1867), in which lawyers were barred from the practice of law.

468 U.S. at 852 n. 9.

[14] Likely cognizant of this shortfall in his argument, Adams presses the point that FTEPA "*effectively* bars senior pilots from employment." *Adams* Appellants' Br. 50 (emphasis added). It is "no surprise," Adams argues, "that only roughly one percent of the affected pilots have been re-hired and others have had to move to third-world countries to find employment." *Id.* at 51. But even if just one percent were rehired under § 44729(e)(1)(B) to pilot Part 121 flights, that is one percent more than would have otherwise been allowed to do so under the old Age 60 Rule.

work. At bottom, there were more piloting opportunities available for over-60 pilots on December 14, 2007, the day after FTEPA went into effect, than December 12, 2007, the day before. If Congress intended the legislation to serve as a barrier to employment, it failed miserably by doing the very opposite: increasing and extending employment opportunities.

This notion of FTEPA as benefit-conferring — the government's leitmotif on appeal — goes a long way to resolve the second, functional factor as well. Under this prong, courts "must consider whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Foretich*, 351 F.3d at 1220 (internal quotation marks omitted). Although over-60 pilots would have doubtless preferred fully retroactive legislation, there is no reason to believe they were entitled to it. From this perspective, we are hard pressed to conclude on these facts that FTEPA somehow imposes an impermissible "burden," never mind fails to advance a legitimate legislative purpose.[15]

As to the third and final prong, we ask whether the legislative record "evinces a congressional intent to punish." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 478 (1977). Rejecting Adams's arguments to the contrary, the court below concluded "there is simply no indication in the 'legislative record' of an intent to punish." *Adams*, 796 F. Supp. 2d at 78. We concur. Not only is it unreasonable in light of the above discussion to say that Congress operated with animus because it conferred only a partial benefit to over-60 pilots, but the

---

[15] We reserve for a future case the question of whether a law fashioned as benefit-conferring could ever be deemed an unconstitutional bill of attainder under the Supreme Court's functional test.

legislative record fails to reveal any malicious intent. To the contrary, speakers such as Representative Oberstar, sponsor of FTEPA, celebrated senior pilots and even moved to expedite the legislation so fewer pilots approaching 60 would find themselves on the opposite side of the retroactivity line. *See* 153 Cong. Rec. H15252-02. Such effusive praise, of course, could only be expected in the debates for the *Fair Treatment for Experienced Pilots* Act.

Finding no impropriety under any of the three factors, we reject the bill of attainder claim.[16]

## III. *EMORY V. UNITED AIR LINES, INC.*

### A. OVERVIEW

The eight *Emory* plaintiffs are former pilots for defendant United Air Lines who turned 60 between December 1 and December 11, 2007, just days before FTEPA's December 13 enactment. Although United removed plaintiffs from their Part 121 flying duties pursuant to the then-operational Age 60 Rule, it was defendant United's custom and practice to allow outgoing pilots to remain employed until the last day of their birth month. *Emory* Compl. ¶ 20. From their birthdays to their

---

[16] Emory's appellate briefing departs from the complaint to bring a second, "distinct" bill of attainder challenge criticizing the District Court's application of § 44729(e)(1)(A) insofar as it allegedly benefits flight engineers at plaintiffs' expense. *Emory* Appellants' Br. 5 n.1; *see also Emory* Appellants' Br. 56–57 ("This [pro-flight engineer] holding by the District Court applying FTEPA amounts to quintessential violation of the Bill of Attainder prohibition."). We read this as a narrowing gloss, a suggestion that the statute was even more discriminatory than previously thought. It does not, however, change the analysis.

"involuntar[y] terminat[ion]" on December 31, it follows, plaintiffs were certified pilots with "unchanged seniority numbers" in United's employ. *Emory* Compl. ¶ 19(c). Pointing to these curious circumstances, plaintiffs believe themselves entitled to the benefits of the Age 65 Rule that governed the final weeks of their employment. In their view, they satisfied § 44729(e)(1)(A), the first exemption to FTEPA's nonretroactivity provision, because it requires only that the exempted pilot be "in the employment of" an air carrier, which they claim they were. *Emory* Compl. ¶ 21(c). To the extent United and ALPA advocated a contrary interpretation, plaintiffs contend, they did so discriminatorily in violation of a host of state and federal laws. We turn to the interpretive question first.

## B. ANALYSIS

### 1. Interpretive Merits

FTEPA admits of two exceptions to the general prohibition on retroactive application:

> (e) (1) Nonretroactivity. No person who has attained 60 years of age before the date of enactment of this section may serve as a pilot for an air carrier engaged in covered operations unless —
>
> > (A) Such person is in the employment of that air carrier in such operations on such date of enactment as a required flight deck crew member; or
> >
> > (B) Such person is newly hired by an air carrier as a pilot on or after such date of enactment

> without credit for prior seniority or prior
> longevity for benefits . . . .

49 U.S.C. § 44729 (e)(1)(A)–(B).

The *Emory* plaintiffs interpret the "in such operations" language in § 44729(e)(1)(A) to modify the term "carrier," not "person." This is significant. If the carrier — and only the carrier — need be engaged in Part 121 operations on the enactment date for the exemption to attach, presumably *any* over-60 individual then in the carrier's employ as "required flight deck crew members" ("RFDCM") would qualify. If one accepts, as plaintiffs do, that RFDCM includes "pilots,"[17] it follows that over-60 pilots who were consigned to non-Part 121 flights or were removed from active flight status by operation of the Age 60 Rule (but remained in the carrier's employ) will also qualify as exempt. But if it were otherwise — if the person invoking the exemption had to actively serve in Part 121 operations on the enactment date — the universe of possible RFDCM shrinks dramatically. The phrase would include only those persons serving secondary roles in Part 121 operations, such as check airmen[18] and flight engineers, since the Age 60 Rule would have barred all Part 121 piloting work.

Plaintiffs' interpretive argument is certainly not without merit. Under the "grammatical 'rule of the last antecedent,' . . . a limiting clause or phrase . . . should ordinarily be read as

---

[17] *See Emory*, 821 F. Supp. 2d at 215. For present purposes, we agree with plaintiffs that a purely facial reading of the statutory phrase would bear this reading. Pity the passengers on a plane with an "optional" pilot.

[18] Check airmen are also known as "second officers." *Emory*, 821 F. Supp. 2d at 210.

modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). As applied here, the rule suggests "in such operations" should modify "that air carrier," the language that immediately precedes it — not "Such person," which begins the sentence. This is a plausible but in no way dispositive interpretation. "[T]he last antecedent rule," we recently observed, " 'is not an absolute and can assuredly be overcome by other indicia of meaning.' " *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013) (quoting *Barnhart*, 540 U.S. at 26). We find such indicia present here.

Emory's interpretation fails to account for the prefatory language in § 44729(e)(1) that bars over-60 persons from serving as pilots "for an air carrier engaged in covered operations" unless they qualify for either one of the two exemptions.[19] Logically, we think, one must read § 44729(e)(1)(A)'s use of "*that* air carrier" as a reference back to § 44729(e)(1)'s "air carrier engaged in covered operation" language. So understood, it would be redundant to do as plaintiffs urge and apply "in such operations" to the already qualified "*that* air carrier" as opposed to "Such persons." The former generates needless surplusage and the latter does not. *See Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2043 (2012) ("[T]he canon against surplusage . . .

---

[19] Whether § 44729(e)(1)'s broad language prohibiting nonexempt, over-60 persons from serving as a "pilot for an air carrier engaged in covered operations" barred pilots from piloting *all* flights (including Part 91 and Part 135 flights) or *just* Part 121 flights for an employer "engaged in covered operations" is a question we need not reach. The *Emory* plaintiffs would not qualify as a RFDCM under either approach and there was no suggestion that plaintiffs sought — and were wrongfully denied — the opportunity to pilot non-Part 121 flights.

favors that interpretation which *avoids* surplusage"). That § 44729(e)(1)(B) speaks unqualifiedly of "an air carrier" only buttresses this view. Having defined the term in § 44729(e)(1), it was unnecessary for the drafters to do so with specificity in either exception.[20]

For these reasons, we reject Emory's interpretation and hold that the "in such operations" language of § 44729(e)(1)(A) modifies "Such person." The implications of such a holding are clear. Because over-60 persons were barred from piloting Part 121 flights under the Age 60 Rule, only those over-60 persons serving as RFDCM in a secondary, non-piloting capacity on December 13, 2007, would have qualified for the exemption.[21] Since "[t]he plaintiff pilots in this case were not, and could not have been, employed as pilots after their respective birthdates" and "had not been reassigned to another 'required flight deck crew

---

[20] We think this holding consistent with FAA's initial efforts to define the nonretroactivity exemptions. In recognizing that the over-60 pilot must have "conduct[ed] part 121 operations for the carrier" on the enactment date to be eligible for an exemption under § 44729(e)(1)(A), FAA effectively read the Act's "in such operations" language to qualify "Some person," not "that air carrier." *See* Two Legal Interpretations Regarding the Age 65 Law Effective 12/13/2007, FAA Information for Operators 07023 (Dec. 20, 2007).

[21] We have elsewhere in this opinion spoken of check airmen and flight engineers as possible RFDCM, but we do not take a formal position as to the scope of a phrase FTEPA does not define. *See Mann v. ALPA*, 2012 WL 1447891, at *4 (M.D. Fla. Apr. 26, 2012).

member' position," the § 44729 (e)(1)(A) exemption plainly "does not apply." *Emory*, 821 F. Supp. 2d at 216.[22]

\* \* \*

On appeal, Emory proffers a handful of confused arguments in an effort to undercut this interpretation of § 44729(e)(1)(A). We are not persuaded.

Emory first suggests the District Court erred when it interpreted the Age 60 Rule to mean plaintiffs "were removed from pilot status and were no longer permitted to serve as pilots" upon turning 60. *Emory* Appellants' Br. 21 (internal quotation marks omitted). We fail to see the point. The only question here is whether plaintiffs were engaged in Part 121 operations as RFDCM on the enactment date and the Age 60 Rule made absolutely clear that plaintiffs could not pilot Part 121 flights. Emory has even conceded as much. *See Emory* Reply 8 ("[The Age 60 Rule] merely bars them while [*sic*] from flying in Part 121 operations.").

Confusing as it may be, Emory next argues we should adopt the competing fiction that pilots turning 60 before the enactment date *were* permitted to fly in Part 121 operations because FTEPA repealed the Age 60 Rule in terms so strong we cannot retroactively assume the Age 60 Rule governed before the enactment date. The argument relies entirely on FTEPA's sunset provision, which declared that the Age 60 Rule "shall cease to be effective" on December 13. 49 U.S.C. § 44729(d). But as is clear from both plain language and a

---

[22] Emory does not appear to challenge the District Court's conclusion that § 44729(e)(1)(B), the "new hire" exception, "has no applicability to the plaintiffs in this case." *See Emory*, 821 F. Supp. 2d at 217.

good dose of commonsense, this argument overreaches. Much as an end presumes a start, a rule that "cease[s]" having effect must have previously been "in" effect. It would be absurd to suggest we have somehow contravened § 44729(d) in recognizing that the Age 60 Rule governed prior to December 13, 2007.

Emory also maintains that because the concept of "RFDCM did not exist as law before December 13, 2007, . . . no Court could determine before FTEPA was enacted if the Emory plaintiffs; [flight engineers]; or check airmen were within the RFDCM." *Emory* Appellants' Br. 23. We think this argument fundamentally flawed. Suffice it to say, courts act well within their authority when they interpret — and then apply — ambiguous statutory language to historical facts. It would be patently absurd to say that Congress can never use terms not previously in existence. *Cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 841 (1984) ("[T]he amended Clean Air Act does not explicitly define what Congress envisioned as a stationary source, to which the permit program . . . should apply." (internal quotation marks omitted)).

Finally, Emory renews an estoppel-by-merger argument that rests entirely on

> the fact that the former Continental Chief Pilot, who is now the United Chief Pilot and Senior Vice-president for Flight Operations following the [Continental-United] merger, took the position while at Continental that check airmen who reached age 60 before . . . the December 13, 2007, enactment of the FTEPA could continue flying as check airmen until age 65 with full seniority . . . under exception (A) . . . because they were [RFDCM].

*Emory*, 821 F. Supp. 2d at 216 n.10 (internal quotation marks omitted). We agree with the District Court, however, that even if one assumes Continental's prior activities would bind United, lobbying FAA to exempt over-60 check airmen but not these uniquely situated over-60 pilots is not the sort of "inconsistent positions that warrant application of the doctrine of judicial estoppel." *Id.* United's interpretation — and our holding — is entirely consistent with the position that check airmen may constitute RFDCM while plaintiffs do not.

## 2. Employment Claims

### i. ADEA (United, ALPA)

Counts One and Two of the *Emory* complaint charge United and ALPA, respectively, with violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* According to the first Count, United knowingly or recklessly advanced an "unlawful interpretation of the Age 65 Act . . . when the plaintiffs clearly met the exception." *Emory* App'x 115.[23] According to the second, ALPA discriminated against older pilots in failing to "refer or sponsor" them "for employment and continued employment" and "colluding with employer United[] to discriminate against these plaintiff union members because of age." *Id.* at 116. The harm in both Counts is "interpretative." Plaintiffs believe defendants discriminated against this discrete class of older pilots by advancing a harmful, artificially narrow interpretation they knew or had reason to know was false.

---

[23] We use the typed page numbers when citing the *Emory* appendix.

26

The District Court's thoroughgoing opinion ably navigated both the threshold exhaustion issues as well as the merits of the ADEA claims, *see Emory*, 821 F. Supp. 2d at 225–33, but the matter can be resolved on appeal without great fuss. Assuming *arguendo* plaintiffs have exhausted their administrative remedies for these particular claims, Counts One and Two fail for the obvious reason that there has been no interpretive harm — United and ALPA did not err in their reading of the relevant statutory and regulatory language. Because their interpretations thus constitute actions "taken in conformance" with the Age 60 and 65 Rules, it follows from the latter's protection-for-compliance provision that they "may not serve as a basis for liability or relief in a proceeding, brought under any employment law or regulation, before any court or agency of the United States or of any State or locality." 49 U.S.C. § 44729(e)(2). In so holding, we read the safe harbor to apply to employers and unions alike. *See Avera*, 436 Fed. App'x at 978–79.[24]

We take the Counts out of order to consider a related but distinct harm next.

---

[24] We think the reasoning of the District Court sound:

The statutory text of the provision is not limited to employers, as the plaintiff suggests; it instead states in broad terms, and without qualification as to the parties to which it applies, that "*[a]n action* taken in conformance with this section . . . may not serve as a basis for liability." 49 U.S.C. § 44729(e)(2) (emphasis added). It would, moreover, be totally irrational to find that United is protected from suit when acting in compliance with the FTEPA, while finding that the ALPA can be sued for permitting United to take such action.

*Emory*, 821 F. Supp. 2d at 218.

### ii. Wrongful Discharge (United)

Count Four, a wrongful discharge claim, shifts the locus of injury from United's interpretation of the Age 65 Rule to bar plaintiffs from returning to Part 121 service to the carrier's decision to involuntarily retire — *i.e.*, terminate — plaintiffs. The distinction is significant. While the statutory language compels the former interpretation, neither the Age 60 nor the Age 65 Rule mandate that carriers terminate pilots who have reached the maximum flying age. Carriers remain free to reassign those pilots to non-Part 121 flights, offer them employment as flight deck crew members, or move them into management positions, though they are by no means obligated to do so.[25] As an entirely practical matter, however, age ceilings tend to generate a surfeit of pilots forced to compete for a limited number of non-Part 121 positions, and one way carriers have responded to this asymmetry is to phase out older pilots through involuntary termination. *See Emory* Compl. ¶ 19(b) ("These circumstances often led to involuntary termination or discharge of the pilot from the employer carrier."). But is this unlawful? Emory certainly

---

[25] We think the Supreme Court's decision in *TWA* sheds some light on the issue. The Court there dealt with a collective-bargaining agreement in which pilots disqualified from flying for reasons *other than age* would "automatically . . . displace less senior flight engineers" while pilots disqualified under the Age 60 Rule had to "bid" for flight engineer positions and retire if there were no vacancies prior their 60th birthday. *TWA*, 469 U.S. at 120. The Supreme Court split the baby in concluding that while the ADEA did "not" require TWA "to grant transfer privileges to disqualified captains," *id.*, TWA had done so and could not now enforce the policy "in a discriminatory fashion, even if [it was] free . . . not to provide the benefit at all," *id.* at 121.

believes it is. In claiming United "wrongfully discharged each plaintiff pilot" in violation of the ADEA, *Emory* App'x 118, Emory has effectively mounted a facial challenge to the legality of United's involuntary retirement program.[26]

The District Court concluded United's involuntary termination of pilots turning 60 years old was not a violation of the ADEA. Mandatory retirement may constitute *prima facie* age discrimination, the lower court reasoned, but compliance with the Age 60 Rule constitutes a bona fide occupational qualification ("BFOQ"), an affirmative defense under the ADEA. *See Emory*, 821 F. Supp. 2d at 230–32. Although the District Court is not alone in this view, there is no consensus among the court of appeals. *Compare Coupé v. Fed. Express Corp.*, 121 F.3d 1022, 1023 (6th Cir. 1997), *with EEOC v. Boeing Co.*, 843 F.2d 1213, 1216–20 (9th Cir. 1988). This Circuit, for one, has already declined to "reach the question whether the Age 60 Rule constitutes a bona fide occupational qualification within the meaning of § 623(f)(1)

---

[26] Some brief clarification is in order. Despite Emory formally raising this claim in Count Four of his complaint, both the District Court and Emory's appellate briefing treat it as a Count One issue, *i.e.*, as an extension of the "interpretive" ADEA claim. *See, e.g.*, *Emory*, 821 F. Supp. 2d at 225. We think distinguishing on the basis of the actual harms alleged is more faithful to the complaint. For similar reasons, we charitably read the *Emory* plaintiffs' footnoted concession that they "will not present arguments on the merits of the wrongful discharge allegations in Court 4 [*sic*]," *Emory* Appellants' Br. 54 n.24, as a formal waiver of Count Four's "FTEPA" and "Public Policy" based unlawful discharge claims, but not the ADEA-based claim.

of that Act." *Prof'l Pilots Fed'n*, 118 F.3d at 763. Believing the question not properly before us, we do the same today.[27]

Plaintiffs in the proceeding below disputed United's claim that their mandatory retirement program is a BFOQ under *Carswell v. ALPA*, 540 F. Supp. 2d 107 (D.D.C. 2008), *see Emory*, 821 F. Supp. 2d at 230–31, but they have not renewed those challenges on appeal. Indeed, Emory's moving brief offers no reason to doubt the District Court's finding in United's favor. The only mention of BFOQ comes in the reply brief and this cursory, paragraph-long discussion offers but one argument: "With the demise of the Age 60 Rule, no BFOQ defense could be mounted against the Emory December pilots for the few days they were under the Age 60 Rule and still in the employment of United." *Emory* Reply 27–28. We accordingly find that the *Emory* plaintiffs waived their BFOQ arguments on appeal, having raised them for the first time in their reply brief. *See, e.g.*, *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

### iii. Breach of the Duty of Fair Representation (ALPA)

Stepping back, Count Three of the *Emory* complaint contends ALPA violated its "duty to each [union] member to provide . . . fair, lawful, and non-discriminatory representation" by knowingly and willfully "scuttl[ing] plaintiff pilots' immensely valuable employment rights on the basis of age and entirely for the advancement of younger pilot union members." *Emory* App'x 117. That duty originates not

---

[27] We likewise reserve judgment on the question whether mandatory retirement programs are so intimately bound with the Age 60 and Age 65 Rules that the former could be said as "in compliance" with the latter, thus triggering § 44729(e)(2), the protection-for-compliance provision.

within the plain language of the Railway Labor Act,[28] which contains no such provision, but through "a series of cases involving alleged racial discrimination by unions" in which "the Supreme Court recognized that the Railway Labor Act imposes a duty on the union to . . . serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *May v. Shuttle, Inc.*, 129 F.3d 165, 177 (D.C. Cir. 1997) (internal quotation marks omitted); *see also Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 199 (1944). As might be expected given the duty's origins as judicially constructed doctrine, the Railway Labor Act is also without a specific statute of limitation. It was only by borrowing the "six-month statute of limitations applicable to claims for breach of the duty of fair representation under Section 10(b) of the National Labor Relations Act," *Emory*, 821 F. Supp. 2d at 233, that the District Court could strike plaintiffs' claim — filed almost one year after termination — as time barred.[29] We think this the right approach.

Where a statute is without an appropriate statute of limitations, "we do not ordinarily assume that Congress intended that there be no time limit on actions at all; rather, our task is to 'borrow' the most suitable statute or other rule of timeliness from some other source." *DelCostello v. Int'l*

---

[28] "In 1936, Congress extended the Railway Labor Act to cover the then small-but-growing air transportation industry." *Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 685 (1963).

[29] The "claim accrued, and the statute of limitations began to run, by the beginning of January 2008 at the latest." *Emory*, 821 F. Supp. 2d at 233. By this point, plaintiffs either knew or should have known both ALPA and United's interpretive positions.

*Bhd. of Teamsters*, 462 U.S. 151, 158 (1983). Although the Supreme Court has "generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law," *id.*, it has acknowledged that "state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law. In those instances, it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law." *Id.* at 161. Such was the case in *DelCostello*, where the Court applied § 10(b), the National Labor Relations Act's six-month limitation period, 29 U.S.C. § 160(b), to a hybrid breach of contract/fair representation claim brought under the Labor Management Relations Act, 29 U.S.C. § 185 *et seq*. In the Court's view, it was simply unnecessary to resort to state law where "a federal statute of limitations actually designed to accommodate a balance of interests very similar to that at stake" was readily available. *DelCostello*, 462 U.S. at 169.

In the wake of *DelCostello*, a majority of the circuits extended § 10(b)'s six-month statute of limitations period to the Railway Labor Act context, *see, e.g.*, *Smallakoff v. ALPA*, 825 F.2d 1544, 1545–46 (11th Cir. 1987) (collecting cases); *Triplett v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Emps., Local Lodge No. 308*, 801 F.2d 700, 702 n.2 (4th Cir. 1986) (same), and the Supreme Court hinted it might do the same, *see West v. Conrail*, 481 U.S. 35, 38 n.2 (1987). This Court has twice applied § 10(b) to Railway Labor Act-based claims without specific limitation provisions. *See May*, 129 F.3d at 177 (breach of duty of fair representation); *Atlas Air, Inc. v. ALPA*, 232 F.3d 218, 222 (D.C. Cir. 2000) (discriminatory anti-union policies). Try as plaintiffs might to distinguish the present case as one in which there was "no time pressure to gather evidence of member discord because there is no

internal remedy," *Emory* Appellants' Br. 52, we see no reason to depart from prior practice. Plaintiffs have failed to cite a single case in which the availability *vel non* of an "internal remedy" was said to alter the limitations calculus. Whether employees have (or have complied with) internal remedies is fundamentally an exhaustion issue; it might *toll* the limitations clock, *see Stevens v. Nw. Ind. Dist. Council, United Bhd. of Carpenters*, 20 F.3d 720, 729 (7th Cir. 1994), but it need not *change* the limitations clock. In sum, we hold that § 10(b)'s six-month limitation period applies to the duty of fair representation claims brought under the RLA.

Emory resorts to tolling arguments in an effort to turn back the clock and save the claim, but the arguments are fundamentally misguided and easily dismissed.

Emory first contends "ALPA is estopped from asserting, and [has] waived a six-month bar" because of a grievance the union filed "attack[ing]" Continental Airline's pre-merger interpretation of the Act. *Emory* Appellants' Br. 53. There are multiple problems with this line of argument. To wit, there is simply no merit to Emory's suggestion that Continental — and thus United — had interpreted FTEPA in plaintiffs' "favor[]." *Emory* Appellants' Br. 54. As explained in *Brooks v. ALPA*, 630 F. Supp. 2d 52 (D.D.C. 2009), Continental read FTEPA to "treat[] flight instructors and check airmen" as RFDCM. *Id.* at 54. Of course, the *Emory* plaintiffs are neither flight instructors nor check airmen and there is nothing necessarily inconsistent about reading "RFDCM" to include these two positions but not the *Emory* plaintiffs.

Emory also alleges futility "under these facts," noting how "ALPA repeatedly rebuffed these December pilots [*sic*] request for help during the transition to the Age 65 limit." *Emory* Appellants' Br. 54. "In this highly charged setting,"

Emory reasons, "it would have been legally futile for the Emory December pilots to present a DFR claim or file a Federal court lawsuit within a dubious six-month limit." *Id.* We think plaintiffs conflate "futile" and "difficult." By their own admission, there were no internal remedies to exhaust. *See id.* at 52. It would not have been *legally* futile to bring suit after their involuntary termination, just difficult. To put matters pointedly, an empty claim of "futility" will not save plaintiffs who chose to sit on their claims.

Count Three against ALPA is thus time barred.

### iv. Fraudulent Misrepresentations (United, ALPA)

Fraudulent misrepresentation in the District of Columbia requires, *inter alia*, proof of a "false representation." *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998). Having thoroughly rejected the complaint's working presumption that United and ALPA erred in their interpretation of FTEPA, *see Emory* Compl. ¶¶ 81–83; *Emory*, 821 F. Supp. 2d at 242, Count Five's fraudulent misrepresentation claim is entirely without basis.[30]

### v. Constitutional Challenges

We dismiss Emory's incorporated constitutional claims for the reasons discussed *supra* in Section II.C.

---

[30] Believing federal law preempted the common law fraud and misrepresentation claim against ALPA but not United, *see Emory*, 821 F. Supp. 2d at 240–42, the District Court reached the merits only with regard to United. Because the matter is easily resolved on the interpretive merits and our holding applies equally to ALPA, we think it unnecessary to reach either the preemption issue or the District Court's alternative grounds for rejecting Count Five.

## IV. CONCLUSION

The pilots in *Emory* and *Adams* are sympathetic plaintiffs, but there is only so far this flawed litigation can go. For the foregoing reasons, the judgments of the District Courts as they pertain to claims not dismissed as moot are therefore

*Affirmed.*