# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 15, 2019   Decided January 28, 2020

No. 18-7141

ALLIANCE OF ARTISTS AND RECORDING COMPANIES, INC., ON
BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,
APPELLANT

v.

DENSO INTERNATIONAL AMERICA, INC., ET AL.,
APPELLEES

Consolidated with 18-7172

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cv-01271)

*Richard B. Dagen* argued the cause for appellant. With
him on the briefs was *Russell Steinthal*. *Daniel K. Oakes*
entered an appearance.

*Andrew Grimm* was on the brief for *amicus curiae* Digital
Justice Foundation, Inc. in support of plaintiff-appellant and
reversal.

*Scott A. Keller* argued the cause for appellees. With him
on the brief were *Paul J. Reilly*, *Benjamin A. Geslison*, *Steven*

*J. Routh*, *Melanie L. Bostwick*, *Annette L. Hurst*, *Andrew Phillip Bridges*, *David Hayes*, *Armen Nercessian*, *Seth David Greenstein*, *Robert S. Schwartz*, *David D. Golden*, *Jessica L. Ellsworth*, *Kirti Datla*, *William D. Coston*, *Megan S. Woodworth*, and *Frank C. Cimino*, *Jr. E. Desmond Hogan* entered an appearance.

*Jonathan Band* was on the brief for *amici curiae* The Computer & Communications Industry Association, et al. in support of affirmance.

Before: HENDERSON and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves actions filed by Appellant Alliance of Artists and Recording Companies, Inc. ("AARC" or "Appellant") pursuant to the Audio Home Recording Act of 1992 ("Act" or "AHRA"), 17 U.S.C. §§ 1001-1010. On July 25, 2014, AARC filed a lawsuit against General Motors LLC, DENSO International America, Inc., Ford Motor Company, and Clarion Corporation of America ("GM/Ford action") for alleged violations of the Act. A second, substantially similar lawsuit was filed by AARC on November 14, 2014, against FCA US LLC and Mitsubishi Electric Automotive America, Inc. ("FCA action"). On February 9, 2015, the District Court consolidated the cases.

In each case, AARC claimed that in-vehicle audio recording devices that copy music from CDs onto hard drives within the devices, allowing the music to be played back inside the vehicle even without the CDs, are "digital audio recording device[s]" under the Act. 17 U.S.C. § 1001(3). Based on this

assertion, AARC alleged that the three suppliers of the devices (DENSO, Clarion, and Mitsubishi), along with the three automobile manufacturers that sold vehicles containing the recording devices (General Motors, Ford, and FCA) (collectively "Appellees") had violated the Act by failing to pay royalties and adopt the required copying control technology with respect to the devices.

On March 23, 2018, after several years of litigation, *see All. of Artists & Recording Cos., Inc. v. Gen. Motors Co. (AARC I)*, 162 F. Supp. 3d 8 (D.D.C. 2016); *All. of Artists & Recording Cos., Inc. v. Gen. Motors Co. (AARC II)*, 306 F. Supp. 3d 413 (D.D.C. 2016); *All. of Artists & Recording Cos., Inc. v. Gen. Motors Co. (AARC III)*, 306 F. Supp. 3d 422 (D.D.C. 2018), the District Court granted Appellees' joint motion for summary judgment, *see AARC III*, 306 F. Supp. 3d at 441. On the same date, the District Court entered an Order confirming its judgments. This Order resolved all the claims in the FCA action and all but the claims based on GM's flash-drive devices in the GM/Ford action. On September 18, 2018, AARC filed a notice of appeal in the FCA action. On October 23, 2018, the District Court granted AARC's unopposed Rule 54(b) motion to enter final judgment as to the hard-drive claims in the GM/Ford action. However, the court reserved judgment on the flash-drive claims and those claims remain pending before the District Court. AARC then filed a timely notice of appeal in the GM/Ford action, and this court consolidated the appeals.

This appeal raises challenging issues regarding the coverage of the AHRA. The Act was passed to address important questions emanating from the advent of digital audio tape ("DAT") recordings in the late 1980s. As digital audio recorders became more common, the prospect of "home copying" loomed as a major issue. Both the companies that

produced the devices and the consumers who used them faced uncertain liabilities under prevailing copyright law. And musicians and record companies, for their part, were concerned that high-quality digital copies would cause serious drops in authorized sales of music recordings. The enactment of the AHRA embodied "a historic compromise" intended to address these issues. S. REP. NO. 102-294, at 33 (1992).

The AHRA exempts the manufacture and use of certain digital audio recorders from copyright infringement actions, thereby dispelling legal uncertainties and ensuring that consumers will have access to the technology. In exchange, the AHRA imposes royalties on certain digital audio recorders and media. The Act also requires covered digital audio recorders to include systems that prevent them from making second-generation copies (*i.e.*, copies of copies), thereby offering some protection to the rights of copyright holders.

In this case, Appellant contends that the "AHRA covers all consumer devices that (1) are capable of digitally reproducing recorded music, and (2) the recording functions of which are designed or marketed for the primary purpose of doing so." Br. for Appellant at 10. Appellant contends that the District Court erred in holding "that the output of Defendants' recording devices must contain 'only sounds' and material 'incidental' to such sounds" to be subject to the proscriptions of the Act. *Id*. at 2. Finally, Appellant argues that, in any event, "Defendants' devices met the district court's test because they stored music to hard drive partitions, which function essentially as separate hard drives, that met this purported 'only sounds' requirement." *Id*. The District Court rejected Appellant's claims. *AARC III*, 306 F. Supp. 3d 422. We do as well.

As a preliminary matter, Appellees argue that AARC's appeal of the District Court's judgment in the FCA action is

untimely because it was filed 179 days after the District Court's Order issued on March 23, 2018. As we explain below, there is no reason for us to address this issue. Our jurisdiction over AARC's appeal in the GM/Ford action is clear. Therefore, we have jurisdiction in a "*companion case*" that presents the same merits questions as the FCA action, and this permits us to "decline[] to decide th[e] jurisdictional question" in the FCA action. *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 920 (D.C. Cir. 2013) (alterations in original) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998)).

On the merits, we affirm the judgments of the District Court. First, we hold that a digital audio recorder is covered by the AHRA only if it can make a "digital audio copied recording" that is also a "digital musical recording" as that term is defined by the Act. Second, we hold that, because it is undisputed that the hard drives in Appellees' devices do not contain "only sounds," they do not qualify as "digital musical recording[s]" and, therefore, the devices do not qualify as "digital audio recording device[s]" subject to the Act. Third, we reject AARC's partition theory. We hold that, at least where a device fixes a reproduction of a digital musical recording in a single, multi-purpose hard drive, the entire disk, and not any logical partition of that disk, is the "material object" that must satisfy the definition of a "digital musical recording" for the recording device to qualify under the Act. These matters are explained in detail in the succeeding sections of the opinion.

## I. BACKGROUND

## A. The Audio Home Recording Act of 1992

### 1. *The Historical Context*

Advances in digital recording technology, together with lingering questions about the legal status of home recording, set the stage for the disagreements and compromises that produced the Audio Home Recording Act of 1992, Pub. L. No. 102-563, 106 Stat. 4237 (codified at 17 U.S.C. §§ 1001-1010).

*The Technology.* In the mid-1980s, consumer electronics manufacturers introduced digital audio recorders to the U.S. market that made it possible for consumers without any special technical expertise to make digital copies of music recordings. These recorders, which eventually included DAT recorders, compact disc ("CD") recorders, digital compact cassette recorders, and mini-disc recorders, represented a significant departure from the status quo because they could produce copies (and copies of those copies) without introducing the hisses, pops, or other distortions that were characteristic of analog audio recorders. As a result, digital audio recorders diminished the incentive of consumers to purchase authorized copies of music recordings. The music industry feared that high-quality digital copies would displace authorized sales of music recordings. *See* S. REP. NO. 102-294, at 34-35.

*The Law.* In the 1980s, a "legal cloud . . . hovered over home taping of sound recordings." 137 CONG. REC. S11,846 (daily ed. Aug. 1, 1991) (statement of Sen. DeConcini). The status of home copying under copyright law had been in doubt since Congress first granted copyrights in sound recordings in the early 1970s. In 1981, the U.S. Court of Appeals for the Ninth Circuit issued its decision in the so-called Betamax case,

*Universal City Studios, Inc. v. Sony Corp. of Am.*, 659 F.2d 963 (9th Cir. 1981), holding that the noncommercial private video taping of broadcast television shows constituted copyright infringement. However, in 1984, the Supreme Court reversed this decision, holding that private home taping of television broadcasts for the purposes of "time-shifting" constituted a fair use of the copyrighted programming. The Court's decision "emboldened DAT manufacturers to claim immunity" for home audio taping. 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8B.01[B] (2019) [hereinafter 2 NIMMER ON COPYRIGHT] (discussing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)).

The dispute over taping continued, however:

The electronics industry . . . maintained that the *Betamax* decision applied to virtually all home taping while songwriters, music publishers, performers, and recording companies . . . insisted that the decision applie[d] to a very limited set of facts, i.e. home video taping for time-shifting purposes. Consequently the controversy . . . continued and in fact [was] exacerbated by the increasing refinement of audio recording technology.

S. REP. NO. 102-294, at 31; *see also* H.R. REP. NO. 102-780, pt. 1, at 18 (1992).

***The Compromise.*** Ultimately, these competing forces pushed the principal stakeholders to the negotiating table. By 1991, the music industry and the consumer electronics industry reached an agreement that set the groundwork for the AHRA. *See* S. REP. NO. 102-294, at 33; H.R. REP. NO. 102-780, pt. 1, at 19. The compromise agreement consisted of three basic parts: First, manufacturers would be required to ensure that

their digital audio recorders included copy-control systems – the "Serial Copy Management System" or an equivalent – to prevent second-generation copying. Second, manufacturers and distributers of covered digital audio recorders (and covered recording media, like blank tapes) would pay modest but certain royalties to a fund established by the Act. Third, both manufacturers and consumers would enjoy immunity from copyright infringement actions based on the noncommercial use of covered digital audio recorders. Thus, the overall compromise was designed to "create[] an atmosphere of [legal] certainty" for the consumer electronics industry, S. REP. NO. 102-294, at 51, "compensate copyright owners and creators for sales displaced by home taping of copyrighted music," *id.* at 32, and thereby "ensure the right of consumers to make . . . digital audio recordings of copyrighted music for their private, noncommercial use," *id.* at 30.

***The Computer Industry.*** One last point on historical context is critical. As Congress refined the proposed legislation to adequately capture the contours of the "historic compromise," it was simultaneously attuned to the interests and concerns of third-party stakeholders – and to the concerns of the computer industry in particular. As we explain below, the legislative history of the AHRA indicates that at least two features of the enacted legislation were meant to ensure that personal computers and computer storage media generally would not be subject to the Act. *See, e.g.*, *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1078 n.6 (9th Cir. 1999) (noting the computer industry's view that, had computers not been excluded from the AHRA, "the computer industry would have vigorously opposed passage of the Act").

First, the definition of "digital audio recording device" includes a "primary purpose" requirement. *See* 17 U.S.C.

§ 1001(3). As a result, personal computers, though often capable of functioning as digital audio recorders in the relevant sense – think, for instance, of personal computers with CD recorders – generally are not subject to the Act because their "recording function is designed and marketed primarily for the recording of data and computer program[s]." S. REP. NO. 102-294, at 48 (contrasting a personal computer with a peripheral device dedicated to digital audio recording); H.R. REP. NO. 102-780, pt. 1, at 27 ("Also, [the AHRA] does not cover general purpose computers because the primary purpose of their recording function is not to make digital audio copied recordings.").

Second, Congress opted to replace the term "phonorecord" in several key provisions of the Act "[a]fter consultation with the computer and telecommunications industries," because "it became apparent that the term 'phonorecord' and its attendant definitions might be overly broad" and might "inadvertently encompass some form of technology that was not intended." S. REP. NO. 102-294, at 35. In its place, Congress inserted a specialized term – "digital musical recording" – that was substantially narrower. A "phonorecord" is, in relevant part, a "material object[] in which sounds . . . are fixed." 17 U.S.C. § 101. In contrast, a "digital musical recording" is a "material object . . . in which are fixed, in a digital recording format, only sounds" and no "computer programs." *Id.* § 1001(5)(A)(i), (B)(ii). In adopting this narrower term, Congress "intended to cover those objects commonly understood to embody sound recordings," S. REP. NO. 102-294, at 36, like "recorded compact discs, digital audio tapes, . . . digital compact cassettes, and mini-discs," *id.* at 36 n.36, and to exclude any objects that "contain[] computer programs or data bases," *id.* at 46.

### 2.    *The Text of the Act*

The AHRA as finally enacted included three principal parts: First, a series of nested definitions of the covered technologies, "carefully tailored so as to limit the effect of the [AHRA] to audio recording," S. REP. NO. 102-294, at 45, while also aiming to remain "technologically neutral" to accommodate future technological developments in digital audio recording, *id.* at 35. Second, a series of provisions specifying the substantive terms of the Act. And, third, a provision governing the remedial authority of federal district courts.

*The Controlling Statutory Definitions.* As noted above, the Act does not regulate digital audio recording as such. Rather, "the Act places restrictions only upon a specific type of recording device," *Diamond*, 180 F.3d at 1075 – *i.e.*, a type that qualifies as a "digital audio recording device" under the AHRA. Section 1001(3) defines a "digital audio recording device" as:

> any machine or device of a type commonly distributed to individuals for use by individuals, whether or not included with or as part of some other machine or device, the digital recording function of which is designed or marketed for the primary purpose of, and that is capable of, making a *digital audio copied recording* for private use . . . .

17 U.S.C. § 1001(3) (emphasis added). In other words, a digital audio recorder is covered by the AHRA only if it satisfies both a "primary purpose" and a "capability" test. The Act proceeds to make an explicit exception for "professional model products," *id.* § 1001(3)(A), as well as for "audio recording

equipment that is designed and marketed primarily for the creation of sound recordings resulting from the fixation of nonmusical sounds," like dictation machines or answering machines, *id.* at § 1001(3)(B).

Next, the Act defines the "digital audio copied recording" that an audio recorder must be "capable of . . . making" in order to count as a digital audio recording device:

> A "digital audio copied recording" is a reproduction in a digital recording format of a *digital musical recording*, whether that reproduction is made directly from *another digital musical recording* or indirectly from a transmission.

*Id.* § 1001(1) (emphasis added).

Finally, the Act defines the term "digital musical recording" that figures in the definition of a "digital audio copied recording" and in other provisions of the AHRA. Section 1001(5)(A) states that a "'digital musical recording' is a material object—"

> (i) in which are fixed, in a digital recording format, *only sounds*, and material, statements, or instructions incidental to those fixed sounds, if any, and

> (ii) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

*Id.* § 1001(5)(A)(i)-(ii) (emphasis added). Section 1001(5)(B) clarifies that a "'digital musical recording' does not include a material object—"

(i) in which the fixed sounds consist entirely of spoken word recordings, or

(ii) *in which one or more computer programs are fixed*, except that a digital musical recording may contain statements or instructions constituting the fixed sounds and incidental material, and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material.

*Id*. § 1001(5)(B)(i)-(ii) (emphasis added).

As explained above, Congress, in consultation with the computer industry, adopted this complex definition to replace the reference to "phonorecord." The most critical change was the requirement that a digital musical recording contain "only sounds" and material incidental to those sounds – a requirement underscored by the exclusion of any object that contains "one or more computer programs" other than programs that bring about "the fixed sounds." In adopting this term, Congress sought to capture "those objects commonly understood to embody sound recordings." S. REP. NO. 102-294, at 36.

***The Substantive Terms of the Act.*** There are several important points to be made about the provisions of the AHRA that give effect to the substantive terms of the "historic compromise."

First, the Act states that "[n]o person shall import, manufacture, or distribute any digital audio recording device . . . that does not conform to . . . the Serial Copy Management System" or does not include a comparable copy-control system

to prevent second-generation copying. 17 U.S.C. § 1002(a). Similarly, the Act prohibits anyone from encoding digital musical recordings with incorrect copyright or copy-generation information or from otherwise circumventing a device's copy-control system. *Id.* § 1002(c)-(d).

Second, the Act provides that "[n]o person shall import into and distribute, or manufacture and distribute, any digital audio recording device . . . unless such person" files notice with the Register of Copyrights, submits regular statements of account, and pays royalties according to a schedule set out in the Act. *Id.* § 1003; *see also id.* §§ 1004-1007 (detailing the process by which royalties are calculated, paid, and then collected by interested copyright holders); 37 C.F.R. §§ 201.27-.31 (2019) (further detailing these processes).

Third, the Act grants immunities from certain copyright infringement actions. Section 1008 provides that:

> No action may be brought under this title alleging infringement of copyright based on the manufacture, importation, or distribution of a digital audio recording device, a digital audio recording medium, an analog recording device, or an analog recording medium, or based on the noncommercial use by a consumer of such a device or medium for making digital musical recordings or analog musical recordings.

*Id.* § 1008. In short, sections 1002 to 1008 of the AHRA set out the substantive benefits and burdens that Appellees would be subject to if their devices fit within the Act's definitions.

***Remedies for Infringements of the Act.*** Finally, the Act contains a civil remedies section, which empowers "interested

copyright part[ies]" injured by violations of the copy-control and royalties provisions to "bring a civil action in an appropriate United States district court against any person for such violation[s]." *Id.* § 1009(a). The courts may, as appropriate, award injunctive relief, actual or statutory damages, and reasonable attorney's fees to the prevailing party. *See id.* § 1009(c)-(d). In addition, a court may order any digital audio recording devices or digital musical recordings involved in violations of § 1002 to be impounded or modified under certain conditions. *See* § 1009(f) ("[T]he court may order the impounding, on such terms as it deems reasonable, of any digital audio recording device, digital musical recording, or device specified in section 1002(c) that is in the custody or control of the alleged violator . . . ."); *id.* § 1009(g)(1)-(2) ("[T]he court may, as part of a final judgment or decree finding a violation of section 1002, order the remedial modification or the destruction of any digital audio recording device, digital musical recording, or device specified in section 1002(c) that . . . does not comply with, or was involved in a violation of, section 1002, and . . . is in the custody or control of the violator or has been impounded under subsection (f).").

## B. Procedural History

On July 25, 2014, AARC filed a lawsuit against GM and Ford and their suppliers DENSO and Clarion ("GM/Ford action") alleging failure to comply with the AHRA's requirements. On November 14, 2014, AARC filed a second, substantially similar lawsuit against FCA and its supplier Mitsubishi ("FCA action"). In both lawsuits, AARC's central allegation was that Appellees manufactured or distributed in-car entertainment systems that enabled consumers to copy audio CDs to on-board hard disk drives (and, in the case of some GM models, solid-state "flash" drives) for later playback. In AARC's view, this feature made Appellees' in-car systems

"digital audio recording device[s]" under the Act and, thus, made Appellees subject to the Act's registration, royalty, and copy-control requirements. On February 9, 2015, the District Court ordered these actions consolidated pursuant to Rule 42 of the Federal Rules of Civil Procedure.

In February 2016, the District Court denied Appellees' motions to dismiss for failure to state a claim and for judgment on the pleadings. In doing so, however, the court adopted Appellees' preferred interpretation of the term "digital audio copied recording." Specifically, the District Court held that a "digital audio copied recording" – the "output" of a covered recording process – must also be a "digital musical recording" under the Act. *AARC I*, 162 F. Supp. 3d at 8-22. In the District Court's view, "the most revealing textual clue" is the word "another" in the definition of "digital audio copied recording." *Id.* at 18. The District Court concluded that "the only plausible reason that Congress would specify that a [digital audio copied recording] made via direct copy would be from *another* [digital musical recording] is if the [digital audio copied recording] itself is also a [digital musical recording]." *Id.* The District Court found that this interpretation was reinforced by the Act's immunity and remedy provisions and was consistent with the Act's history and purpose. *See id.* at 18-20. The court then concluded that, although typical computer hard drives would not qualify as "digital musical recording[s]," AARC's complaint sufficed to make it plausible that at least some of Appellees' challenged devices might qualify. *See id.* at 22-23. The District Court denied AARC's motion for reconsideration but granted its motion for clarification, noting that *AARC I* did not preclude AARC from raising its partition theory in subsequent proceedings. *See AARC II*, 306 F. Supp. 3d. at 418-20.

The parties then embarked on an initial phase of discovery to determine whether Appellees' hard drives contain disqualifying computer programs or data. (A second phase, focused on GM's flash drives, is pending.) In short, the undisputed evidence in the record shows that Appellees' devices fix digital reproductions of audio CDs in single-platter hard disk drives that also contain programs and data not incidental to those sounds. For example, the Clarion devices supplied to Ford "contain[] software and data, including software for displaying vehicle climate information; software for playing satellite radio, AM/FM radio, and sound files from DVDs, audio CDs and data CDs; software for displaying video from the rear view camera; software for uploading photographs, and also data for maps . . . ." *AARC III*, 306 F. Supp. 3d at 431 (internal quotation marks and brackets omitted) (quoting Defs.' Statement of Undisputed Facts ¶ 1(d), *reprinted in* Joint Appendix ("J.A.") 310-11). The evidence produced in discovery also indicates that Appellees' devices copy CDs to specific hard drive partitions – to subdivisions of the drives, defined by software, that can function as independent drives – and that these partitions arguably contain "only sounds" and materials incidental to those sounds.

On March 23, 2018, the District Court granted Appellees' joint motion for summary judgment. *AARC III,* 306 F. Supp. 3d 422. First, the District Court affirmed its position that an audio recorder is a "digital audio recording device" only if it is capable of making a "digital audio copied recording" that is itself a "digital musical recording" under the Act. *Id.* at 425-26. Second, the court found that, "based on the evidence presented, . . . the hard drives in Defendants' devices contain all sorts of programs and other materials, such that they do not qualify as [digital musical recordings], and as a result, the devices themselves are not [digital audio recording devices] subject to the AHRA." *Id.* at 428-29. Finally, the District Court rejected

AARC's alternative theory that Appellees' devices are digital audio recording devices because they copy music to hard drive partitions that contain "only sounds" and therefore qualify as "digital musical recording[s]." The District Court ruled that a hard drive partition is not a "material object" for purposes of § 1001(5), because it lacks a "*distinct* physical identity such that it can be considered a 'material object' *apart from* the hard drive on which it exists." *Id.* at 432. The District Court also held that, even if partitions were "material object[s]," "AARC has failed to establish that the AHRA's statutory definitions require consideration of a smaller unit of output than the hard drive as a whole." *Id.* at 429. In fact, the court reasoned, AARC's theory is fundamentally at odds with Congress's choice to make an object's status as a "digital musical recording" depend on what else besides music is fixed in it. *See id.* at 440.

On March 23, 2018, the District Court issued a Memorandum Opinion. The court also issued a separate Order with the following clauses:

> For the reasons stated in the accompanying Memorandum Opinion, it is hereby **ORDERED** that Defendants' Joint Motion for Summary Judgment is **GRANTED**. It is **FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment as to GM and Denso, Plaintiff's Motion for Partial Summary Judgment as to Ford and Clarion, and Plaintiff's Motion for Partial Summary Judgment as to FCA and Mitsubishi, are **DENIED**.

J.A. 583 (citations to the docket omitted). This Order resolved all the claims in the FCA action, and all but the flash-drive claims in the GM/Ford action.

On September 18, 2018, AARC filed a notice of appeal in the FCA action. The timeliness of that notice is addressed below. On October 23, 2018, the District Court granted AARC's unopposed Rule 54(b) motion to enter final judgment as to the hard-drive claims in the GM/Ford action. However, the court reserved judgment on the flash-drive claims, which remain pending in the District Court. AARC then filed a timely notice of appeal in the GM/Ford action, and this court consolidated the appeals.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* the District Court's grant of summary judgment and its underlying interpretation of the AHRA. *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 63 (D.C. Cir. 2018) ("This Court reviews a district court's grant of summary judgment *de novo*."); *United States v. Cordova*, 806 F.3d 1085, 1098 (D.C. Cir. 2015) (per curiam) ("We review questions of statutory interpretation *de novo*."). Summary judgment for Appellees is appropriate only if, viewing the evidence in the light most favorable to AARC, *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006), there is "no genuine dispute as to any material fact and [Appellees are] entitled to judgment as a matter of law," FED. R. CIV. P. 56(a).

### B. Jurisdiction

In response to our order to the parties to address this court's jurisdiction over AARC's appeal in the FCA action, Appellees now argue that we lack jurisdiction because AARC filed its notice of that appeal out of time. In general, "[t]he time limits established by Rule 4(a) [of the Federal Rules of Appellate Procedure] are 'mandatory and jurisdictional.'" *Kidd*

*v. District of Columbia*, 206 F.3d 35, 38 (D.C. Cir. 2000) (quoting *Moore v. South Carolina Labor Bd.*, 100 F.3d 162, 163 (D.C. Cir. 1996) (per curiam)). Rule 4(a) says that a party must file notice of appeal "within 30 days after entry of the judgment." FED. R. APP. P. 4(a)(1)(A). And that 30-day clock starts when judgment is entered in the civil docket and (1) that judgment is also set out in a "separate document" or (2) 150 days pass – whichever is earlier. FED. R. CIV. P. 58(a), (c); FED. R. APP. P. 4(a)(7)(A)(ii).

AARC filed a notice of appeal in the FCA action 179 days after the District Court entered its summary judgment order in the docket. Therefore, AARC's notice was in time *if* the document containing the District Court's final judgment did not satisfy Rule 58's "separate document" requirement, in which case AARC had 180 days to file. Appellees contend that the District Court's Order – a document containing the ordering clauses reprinted above – is a "separate document" for purposes of Rule 58 because it is separate from the court's Memorandum Opinion and "omits legal reasoning." Br. for Appellees at 23 (citing *Kidd*, 206 F.3d at 39). AARC, for its part, argues that the District Court's final judgment in the FCA action must also be separate from the court's merely interlocutory order in the consolidated GM/Ford action, given the Supreme Court's instruction that cases consolidated pursuant to Rule 42 "retain their 'independent character'" and, thus, require "separate decrees or judgments." Br. for Appellant at 13-14 (quoting *Hall v. Hall*, 138 S. Ct. 1118, 1125, 1128 (2018)).

It is unnecessary for us to determine the proper application of Rule 58's "separate document" requirement to the facts of this case. In general, of course, we must assure ourselves of our jurisdiction before addressing the merits. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). But there are

several narrow exceptions to that rule, and this case falls in one. "[W]here 'the merits question [is] decided *in a companion case,* with the consequence that the jurisdictional question could have no effect on the outcome,' courts are free to 'decline[ ] to decide th[e] jurisdictional question.'" *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 920 (D.C. Cir. 2013) (second, third, and fourth alterations in original) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998)); *see also Sherrod v. Breitbart*, 720 F.3d 932, 937 (D.C. Cir. 2013) (explaining that a court may assume jurisdiction when the merits decision is "foreordained" by another of the court's decisions).

Here, crucially, there is no doubt about our jurisdiction over AARC's appeal in the GM/Ford action. Therefore, we have jurisdiction in a "companion case" that presents the same merits questions as the FCA action, and our decision in the companion case will effectively "foreordain" our decision in the FCA action. As a result, our disposition of the matter before us will not "carr[y] th[is] court[] beyond the bounds of authorized judicial action," *Steel Co.*, 523 U.S. at 94, because we will not be using "the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed," *id.* at 98. We therefore turn to the merits issues common to both appeals without regard to whether we have jurisdiction over AARC's appeal in the FCA action.

**C. The Issues Regarding the Meaning of the Audio Home Recording Act of 1992**

    **1.** *A "Digital Audio Copied Recording" Must Also Be a "Digital Musical Recording" Under the AHRA*

        The first merits question in this case concerns the proper interpretation of the AHRA's definition of "digital audio copied recording." This statutory term is critical because a digital recording technology, including any of Appellees' CD-copying devices, is covered by the Act only if it is "capable of . . . making a digital audio copied recording." 17 U.S.C. § 1001(3). The parties are at odds over whether the Act's definition of the term "digital audio copied recording" implies that digital audio copied recordings must also be "digital musical recording[s]" under the Act.

        The District Court offered the following diagram to illustrate the relationship between the relevant statutory terms:



*AARC I*, 162 F. Supp. 3d at 12. The central question in this case is whether the "outputs" on the righthand side must be "digital musical recording[s]" under the Act. We hold that they must be. That is, Appellees' devices are subject to the restrictions of the AHRA only if they are capable of making reproductions of

digital musical recordings, which reproductions are themselves digital musical recordings.

Our reading of the Act is compelled by the word "another" in the definition of "digital audio copied recording." A digital audio copied recording is a "reproduction . . . of a digital musical recording, whether that reproduction is made directly from *another* digital musical recording or indirectly from a transmission." 17 U.S.C. § 1001(1) (emphasis added). The ordinary meaning of "another" in this context is "one more in addition to one or a number of the same kind." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 89 (1993); *see also* 1 OXFORD ENGLISH DICTIONARY 495 (2d ed. 1989) ("A second, further, additional."). As the District Court correctly noted, the most plausible reason that Congress would say that a reproduction "made directly" would be from *another* digital musical recording is if the reproduction itself is also a digital musical recording.

Other provisions in the AHRA reinforce this interpretation of "digital audio copied recording." Most important, the Act provides immunity from suit "based on the noncommercial use by a consumer of [digital audio recording devices or digital audio recording media] for *making digital musical recordings.*" 17 U.S.C. § 1008 (emphasis added). This provision makes no mention of immunity for making digital audio copied recordings, but instead digital musical recordings. That silence suggests that Congress intended that digital audio copied recordings be digital musical recordings. In addition, the Act empowers courts to impound or order the modification of "any digital audio recording device, digital musical recording, or [device designed to bypass the copy-control system of a digital audio recording device]" that meets certain further conditions. *Id.* § 1009(f)-(g). Once again, no reference to digital audio copied recordings.

If, as AARC contends, the Act's definitions include digital audio copied recordings that are not digital musical recordings, then the Act's immunity and remedial provisions would not make much sense. Under AARC's view, the Act would afford immunity only when consumers make one kind of digital audio copied recording rather than another. And the Act would give the courts certain remedial authority only when they confront one kind of digital audio copied recording rather than another. There is no indication that Congress intended such a curious result. If, on the other hand, a digital audio copied recording simply is a special kind of digital musical recording (*viz.*, one that is the output of a covered digital copying process), then Congress's failure to make special provision for digital audio copied recordings is no surprise. By covering digital musical recordings, it covers digital audio copied recordings as well.

Because the text of § 1001(1) is clear, "there is no reason to resort to legislative history." *United States v. Gonzales*, 520 U.S. 1, 6 (1997). Still, it is worth emphasizing that our interpretation of "digital audio copied recording" is consistent with the Act's history and purpose. As explained above, the AHRA was intended to encompass a specific kind of recording technology. It is notable, then, that the digital audio recorders that Congress treated as models for the AHRA's definitions – principally DAT and CD recorders – typically produced copies of digital musical recordings that were themselves digital musical recordings. For example, a CD recorder is typically capable of making "another digital musical recording." As a result, the legislative history is (at the very least) consistent with the claim that, in giving effect to the underlying compromise, Congress expected that current and future digital audio recording devices would operate by making "another digital musical recording."

AARC argues that this interpretation of the Act is "hypertechnical" and inconsistent with the AHRA's text, history, and purpose. We find no merit in these arguments, which rest on equivocal legislative history and AARC's sense of sound policy. After all, "[e]ven for those of us who make use of legislative history, ambiguous legislative history cannot trump clear statutory language." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 634 n.9 (2018) (internal quotation marks omitted) (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011)). And in general, "[t]he best evidence of [a law's] purpose is the statutory text," *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), and most certainly when that text is the result of carefully negotiated compromise among the stakeholders who will be directly affected by the legislation.

It is quite clear here that AARC's textual arguments are meritless. For AARC's theory to prevail – for the definition of "digital audio copied recording" to encompass both digital musical recordings and other digital copies – we would have to ignore the word "another" in the phrase "another digital musical recording." But there is nothing in the text of § 1001(1) or anywhere else in the text of the AHRA to support AARC's proposed revision.

AARC points out that an earlier, unenacted version of the AHRA defined a "digital audio copied recording" as

> a reproduction of a phonorecord in a digital recording format, whether that reproduction is made directly from another phonorecord or indirectly from a transmission.

Br. for Appellant at 35 (quoting earlier proposed legislation in both the House and Senate). Because a "phonorecord" is an object in which sounds – but not necessarily "only sounds," 17

U.S.C. § 101 – are fixed, a reproduction of a phonorecord would typically qualify as a phonorecord, even if the output had other data fixed in it, so the word "another" did not impose meaningful limits on the output side. As AARC puts it, "the result would have been identical had [the definition] referred to a reproduction made directly from . . . 'a phonorecord.'" Br. for Appellant at 35. This is an interesting point, but it is irrelevant. The problem with AARC's argument is that Congress deleted the reference to phonorecord in the enacted version of the Act. When Congress substituted the term "digital musical recording" in the enacted legislation, the phrase "another digital musical recording" was decidedly not interchangeable with the phrase "a digital musical recording." The first phrase clearly imposes the "only sounds" requirement on the output side, the second does not.

AARC maintains that the late change in the legislation was not a "closely consider[ed]" choice to restrict both the inputs and outputs of the copying process. *Id.* Rather, according to AARC, it was an effort by Congress to restrict the input side alone, and Congress simply failed to appreciate the effect of leaving the word "another" in place. In AARC's view, a clue that Congress did not mean to restrict the outputs – and, thus, that it meant to delete "another" in favor of a less restrictive term – is that Congress left the phrase "in a digital recording format" in the definition of a "digital audio copied recording." This phrase would be redundant, AARC points out, if digital audio copied recordings were themselves digital musical recordings, because digital musical recordings are "in a digital recording format" by definition. *See* 17 U.S.C. § 1001(5)(A)(i).

We find it far more straightforward to read "in a digital recording format" as surplusage than to read "another" out of the AHRA entirely. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011) ("[T]he canon against superfluity assists

only where a competing interpretation gives effect to every clause and word of a statute." (internal quotation marks and citation omitted)). It is simple enough to explain why the redundant phrase "in a digital recording format" might have been overlooked in the drafting process. For one thing, the change merely confirmed that outputs of the copying process would be digital. For another, the revised text that created the surplusage was embedded in the complex, multi-part definition of "digital musical recording." In contrast, we find no comparably strong evidence that the word "another" can be explained as a simple drafting error. On the contrary, that term was in the AHRA from the start, which suggests that Congress always envisioned that inputs and outputs would be of the same general kind. And this conclusion is reinforced by the fact that Congress shaped the text to fit digital audio recorders whose outputs were typically digital musical recordings.

We could go on, but it would be pointless. AARC's fundamental problem is that it seeks to rely on ambiguous legislative history that cannot possibly trump clear statutory language.

We understand that time and technological change may have rendered the AHRA's compromise less palatable to AARC and its constituents. Some commenters have observed that the increased role of computers in digital audio recording has made the AHRA's role more marginal than its proponents envisioned. 2 NIMMER ON COPYRIGHT § 8B.02[A][1][a][ii] ("[T]he failure of [DAT recorders and other technologies at the heart of the Act] to ever make much penetration into the consumer marketplace renders the AHRA's focus, in hindsight, misguided."). It is certainly likely that the disputes before Congress would have been conducted on different terms in 2002 than they were in 1992, given the rise of computer-based audio recording technologies during that ten-year stretch. *See*

Aaron L. Melville, *The Future of the Audio Home Recording Act of 1992: Has It Survived the Millennium Bug?*, 7 B.U. J. SCI. & TECH. L. 372, 383-86, 388-96 (2001) (explaining, from the perspective of 2001, how the rise of MP3s and the Ninth Circuit's decision in *Diamond* made the AHRA "rapidly . . . outdated," *id.* at 374). Still, we cannot enforce the law that AARC thinks Congress should have written rather than the carefully negotiated text that Congress adopted. Ultimately, if AARC and its supporters "have persuasive arguments in support of the change of law they advocate, it is Congress they should persuade." *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 664 (2d Cir. 2018).

### 2. *Appellees' Hard Disk Drives Are Not "Digital Musical Recording[s]" and, Therefore, Their Devices Are Not "Digital Audio Recording Device[s]" Under the AHRA*

We turn next to the in-car CD-copying devices at issue in this case. We hold that Appellees' devices are not "digital audio recording device[s]" subject to the Act because the undisputed evidence shows that the hard drives to which their devices reproduce audio CDs are not themselves digital musical recordings under the Act. As a result, Appellees' devices are not "capable . . . of making digital audio copied recording[s]" and, therefore, they fall outside the Act's carefully negotiated definitions.

To start, it is well-established that typical computer hard drives are not "digital musical recording[s]" under the AHRA because they fall in § 1005(B)(ii)'s explicit exception for objects that contain "one or more computer programs." The Ninth Circuit adopted this position in *Recording Industry Ass'n of America v. Diamond Multimedia Systems, Inc.*, 180 F.3d

1072 (9th Cir. 1999), and its understanding of the AHRA has proved influential. As the Ninth Circuit wrote:

> The typical computer hard drive . . . is, of course, a material object. However, hard drives ordinarily contain much more than "only sounds, and material, statements, or instructions incidental to those fixed sounds." Indeed, almost all hard drives contain numerous programs (e.g., for word processing, scheduling appointments, etc.) and databases that are not incidental to any sound files that may be stored on the hard drive.

*Id.* at 1076 (citation omitted). As a result, the court reasoned, the typical computer hard drive is not a digital musical recording under the Act. *Id.*; *see also id.* at 1077 ("There are simply no grounds in either the plain language of the definition or in the legislative history for interpreting the term 'digital musical recording' to include songs fixed on computer hard drives."); *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1024 (9th Cir. 2001) ("[T]he Audio Home Recording Act does not cover the downloading of MP3 files to computer hard drives," in part because "computers do not make 'digital music[al] recordings' as defined by [the Act].").

To be sure, the Ninth Circuit confronted this question in a context that differs from the situation in this case. There, a hard drive served as the input to the copying process and, thus, the question was whether a digital copy created *from* a hard drive counted as "a reproduction . . . of a digital musical recording." But this difference does not make the Ninth Circuit's interpretation of the statutory term "digital musical recording" any less persuasive, and we adopt its interpretation here. No material object can count as a digital musical recording if it contains "one or more computer programs" that are not

incidental to any sounds fixed in that object, and that includes typical hard disk drives.

The critical question in discovery during the proceedings before the District Court was whether the hard disk drives in Appellees' CD-copying devices were "typical computer hard drives" in these key respects. The undisputed answer is "yes." As the District Court explained:

> Based on the evidence and information gathered during the discovery period in this case, it is clear that the hard drives in Defendants' multimedia devices are, indeed, "full of non-music data and computer programs," as Defendants previously maintained. Indeed, each of the hard drives in Defendants' devices "includes computer programs, data, or other material" that are *not* incidental to the fixed sounds, and though the exact contents vary based on device, the in-vehicle systems include such things as navigation software, DVD players, displays of album art and information, and AM/FM and satellite radio functions.

*AARC III*, 306 F. Supp. 3d at 430-31 (citations omitted); *see also id.* at 431 (summarizing the contents of several of Appellees' systems in more detail); J.A. 327-34 (documenting the undisputed facts about Appellees' devices). Therefore, we agree with the District Court that, even interpreting the evidence in the light most favorable to AARC, Appellees' CD-recording devices are not capable of making reproductions of digital musical recordings that are themselves digital musical recordings. As a result, Appellees are entitled to judgment as a matter of law because their devices are not "digital audio recording device[s]" subject to the AHRA.

AARC concedes that *if* a "digital audio copied recording" must be a "digital musical recording," and *if* Appellees' devices qualify only if their entire hard disk drives are "digital audio copied recording[s]," then Appellees' devices are not "digital audio recording device[s]" subject to the AHRA. But AARC disputes the truth of the second condition. (The first, too, of course, but we have already rejected that view.) Specifically, AARC argues that Appellees' in-car CD-copying devices can be covered by the Act if they reproduce digital musical recordings to specific hard drive *partitions* that qualify as digital musical recordings under the Act. We reject AARC's partition theory as incompatible with the proper, context-sensitive interpretation of the statutory text.

A hard drive partition is a subdivision of the storage disk that can function as a separate drive. Hard drives are typically partitioned to make it easier to organize files, or to back up or protect data, or to improve performance. To create partitions, a computer is programmed, using a "partition table," to treat ranges of "logical block addresses" as distinct storage drives. J.A. 339. These addresses correspond to locations or regions of the physical storage disk. *Id.* For example, though every storage drive must contain at least one partition, *id.* at 338, some disk drives are further partitioned into address blocks that correspond to concentric circles on the physical disk. The following image offers a simple example of a partitioned drive:



*See, e.g.*, *id.* at 375 (using a similar diagram to illustrate one possible set of partitions). There is nothing in the concept of a hard drive partition that requires the address blocks to correspond to contiguous regions of single disks, however. A computer could be programmed to treat locations at different parts of one disk – or even locations scattered across different disks – as a functionally unified storage drive. *Id.* at 339.

The evidence appears to indicate that Appellees' devices contain hard drive partitions dedicated to music storage, *see id.* at 376-430 (partially under seal), and that is what we shall assume here. AARC says that, although some properties of hard drive partitions depend on "the perspective of the [computer's] operating system and applications," Br. for Appellant at 44, partitions "are not abstractions," *id.* at 43. Rather, according to AARC, partitions are "tangible, well-defined regions of a hard drive's 'platter,' the metes and bounds of which could be traced on the platter, such that one could physically touch one partition or another." *Id.* at 43-44. Given its view of partitions, AARC contends that hard drive partitions are "material object[s]" within the ordinary meaning of those words. AARC thus concludes that if partitions are material objects, then they can also be "digital musical recording[s]" so long as they satisfy the rest of the requirements set out in § 1001(5). *Id.* at 43.

Metaphysically speaking, AARC's position is interesting. It fails, however, pursuant to the norms of statutory interpretation that govern our review of this matter. We can grant that, at least in some contexts, the physical region corresponding to a hard drive partition is a "material object" in ordinary English. But that does not settle the question of whether Appellees' hard drive partitions are the "material object[s]" that matter when applying the AHRA to devices that copy music to single-platter, multi-purpose hard drives. To answer that question, we must read the phrase "material object" in § 1001(5) in the proper context. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 532 (2015) (plurality opinion) (interpreting "tangible object" to exclude a fish, given the Sarbanes-Oxley Act's focus on objects involved in recordkeeping). And we know that, in enacting the AHRA, Congress had a particular kind of "material object" in mind, exemplified by the objects involved in digital audio recording at the time, like digital audio tapes, compact discs, and mini-discs. That understanding must guide our application of the term "material object" under § 1001(5).

In the case before us, we have no trouble concluding that the storage disks contained in typical hard drives, like the recordable tapes and discs that lawmakers considered in 1992, are the sorts of "material object[s]" that the AHRA contemplates serving as "digital musical recording[s]" if they otherwise satisfy the Act's terms. *See* S. REP. NO. 102-294, at 46 ("The intention is for the term '[digital musical recording]' to cover objects commonly understood to embody sound recordings and their underlying works, such as recorded compact discs (CD's) . . . [and] digital audio tapes (DAT's) . . . ."); *id.* at 49 (listing "magnetic digital audio tape cassettes, optical discs, and magneto-optical discs" as examples of the kinds of "digital audio recording media" that

Congress expected consumers to use in "making digital audio copied recordings"). We also have no trouble concluding that the drive partitions at issue in this case are not subject to the strictures of the Act. We therefore hold that, at least where a device fixes a reproduction of a digital musical recording in a single-platter hard drive disk, the entire disk, and not any logical partition of that disk, is the "material object" that must satisfy the definition of a "digital musical recording" for the recording device to qualify under the Act.

Our commonsense, context-sensitive reading of the AHRA is confirmed by the fact that AARC's proposed alternative has no clear limiting principle. At bottom, AARC's strategy in this case is to zero in on the area of a material object where sounds are fixed and *then* apply § 1001(5)'s "only sounds" test. But this idea, taken to its limits, would imply that any material object containing sounds is a material object that can pass the "only sounds" test. All one need do is focus on the part of the object where music files are fixed and ignore the data fixed in other regions of the object. The problem, of course, is that this divide-and-apply strategy risks collapsing the distinction between "phonorecords" and "digital musical recording[s]" that Congress was careful to erect. AARC responds that we "do[] not need to determine the outer bounds of Congress's definition in this case," because partitions are "far more similar to drives (which even the district court agrees are material objects) than are individual digital music files." Br. for Appellant at 52. But this response simply dodges the question. As the District Court aptly noted, it is only by considering all the relevant logical implications – and not just the convenient ones – that we can decide whether a reading of the statutory text adequately captures Congress's intent. *See AARC III*, 306 F. Supp. 3d at 440. The problem with AARC's proposed stopping point is that it shifts the focus from Congress's explicit instruction to look at whether sounds are

fixed in an object of a certain sort to an inquiry into whether sounds are fixed in something that arguably functions like such an object.

AARC's other arguments are similarly misplaced. AARC points to decisions of other courts that a "portion of" or "segment of" or "location on" a hard drive can constitute a "phonorecord" – and hence a "material object," 17 U.S.C. § 101 – for purposes of copyright law. Br. for Appellant at 49 (citing *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 657 (2d Cir. 2018) and *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 153, 171 (D. Mass. 2008)). AARC argues that our position is inconsistent with these decisions. We disagree.

Our view is not that a hard drive partition could never be a "material object" as that term is used in Title 17. We take no position on that. Our view is only that a partition is not the object that should be subjected to the § 1001(5) analysis under the AHRA when (as here) a device makes digital copies on a typical single-disk hard drive. The definitions of "phonorecord" and "digital musical recording" both use the term "material object," but the term arises in different contexts, serves different purposes, and (thus) makes different kinds of objects salient. We find AARC's arguments based on the *in pari materia* canon unconvincing for similar reasons. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006) (reasoning that "location" means something different in provisions governing venue and subject-matter jurisdiction, despite the *in pari materia* presumption, because those "are not concepts of the same order").

## D. Matters Not Decided

In closing, we underscore, first, that we leave many important questions about the AHRA unaddressed. Thus, we

do not pass judgment on Appellant's alternative theory that a device qualifies as a "digital audio recording device" only if its copied outputs "are separate from a recording device." Br. for Appellee at 51. And, although we agree with *Diamond* about the meaning and application of the term "digital musical recording" to typical computer hard drives, we take no position on *Diamond*'s conclusion that the device at issue in that case was not subject to the AHRA because, in copying music from a typical hard drive, it did not make "a reproduction . . . of a digital musical recording" either "directly" or "indirectly from a transmission." *See* 180 F.3d at 1076-81 (discussing 17 U.S.C. § 1001(1)).

Second, although our analysis may have implications in other cases, "[w]e cannot now answer more precisely how the [AHRA] or other provisions of the Copyright Act will apply to technologies not before us." *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 450 (2014). Any such questions "should await a case in which they are squarely presented." *Id.* at 451 (internal quotation marks and citation omitted).

Third, we note that, in holding that Appellees' devices fall outside the scope of the AHRA, we do not hold (or even suggest) that Appellees fall outside the reach of copyright law entirely. We understand that Appellees may be subject to the liabilities and defenses otherwise provided in Title 17 (or other laws), as may be applicable. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1024 (9th Cir. 2001) (holding that Napster could not invoke § 1008 as a defense to copyright infringement claims because its technology did not fit within the AHRA's definitions).

Finally, we again note that, to the extent that AARC and its supporters are "concerned with the relationship between the development and use of [digital audio recording] technologies

and the [AHRA], they are of course free to seek action from Congress." *Aereo*, 573 U.S. at 451.

### III. CONCLUSION

For the reasons set forth above, we affirm the judgments of the District Court.

*So ordered.*